**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

In re:

      **RUSSELL STITES,**

Debtor.

**Case No. 20-40703-BTR**
**Chapter 13**

**MOTION OF REGIONS BANK**
**TO RETROACTIVELY ANNUL THE AUTOMATIC STAY AS TO CERTAIN REAL**
**PROPERTY SOLD AT FORECLOSURE SALE ON MARCH 5, 2020**

**14-DAY NEGATIVE NOTICE**

**Your rights may be affected by the relief sought in this pleading.  You should read this pleading carefully and discuss it with your attorney, if you have one in this bankruptcy case.  If you oppose the relief sought by this pleading, you <u>must</u> file a written objection, explaining the factual and/or legal basis for opposing the relief.**

**No hearing will be conducted on this Motion unless a written objection is filed with the Clerk of the United States Bankruptcy Court and served upon the party filing this pleading *<u>WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE</u>* shown in the certificate of service unless the Court shortens or extends the time for filing such objection.  If no objection is timely served and filed, this pleading shall be deemed to be unopposed, and the Court may enter an order granting the relief sought.  If an objection is filed and served in a timely manner, the Court will thereafter set a hearing with appropriate notice. If you fail to appear at the hearing, your objection may be stricken.  The Court reserves the right to set a hearing on any matter.**

**COMES NOW** Regions Bank ("Regions"), by and through its undersigned counsel, and, files this *Motion of Regions Bank to Retroactively Annul the Automatic Stay as to Certain Real Property Sold at Foreclosure Sale on March 5, 2020* (the "Motion"), and in support thereof would show the Court the following:

## I.    <u>INTRODUCTION</u>

As a threshold matter for the Court, this Motion should be considered in tandem with the recent developments in the Chapter 11 Proceeding of Pro South, Inc., Case No. 19–42427 (the "Pro South Case"), which is also pending in this Court. The Debtor, in this Chapter 13 Proceeding, Russell M. Stites ("RMS") owns 100% of the stock in Pro South, and upon information and belief, continues to control the day-to-day operations of Pro South. As will be discussed in greater detail below, the Pro South Case was filed on September, 4, 2019 to forestall a prior foreclosure sale by Regions. The Pro South Case has been an abject failure as a Chapter 11, and Regions was recently granted relief from the automatic stay in that case to exercise its rights and remedies *against the exact same collateral that is the subject of this Motion*. Moreover, Pro South now seeks to dismiss its bankruptcy, having accomplished nothing in the 194 days since filing its bankruptcy except delaying foreclosure.

RMS has abused the bankruptcy process for almost two full years, filing six cases across two states, on his own behalf, and through 3 of the companies he controls, each on the eve of, or the day of, foreclosure of interests in property securing loans he long ago stopped paying. His most recent attempt to use bankruptcy as a sword, rather than a shield, came as Regions conducted a duly noticed and published foreclosure sale with no knowledge that RMS, a Mississippi resident, had filed a Chapter 13 petition in this Court approximately 15 minutes before the foreclosure sale began. In light of RMS's repeated bad faith in the filing the bankruptcies for himself or his businesses to avoid foreclosure, as well as the other grounds enumerated in 11 USC 362(d), Regions seeks an order from this Court annulling the automatic stay with respect to the now-concluded foreclosure, thereby retroactively validating the foreclosure sale conducted by Regions. If the Court is not inclined to annul the stay as to the residence of RMS, Regions seeks an Order from the Court that the foreclosure sale is valid as to all of the property owned by: (i) Pro South,

2

(ii) Pro Logging, Inc., another company owned by RMS, (iii) RMS's spouse, Amy Glisson Stites. Regions additionally requests that the Court would annul the automatic stay as to any non-residential property owned by RMS that was sold in the foreclosure sale.

## II.   PROCEDURAL BACKGROUND

1.      On March 5, 2020 (the "Petition Date"), RMS, an individual, filed a Chapter 13 petition (the "Bankruptcy Petition") for relief under 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"). The Court's stamp on the Petition indicates that it was filed at 11:15 AM.

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 362. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

## III.   FACTUAL BACKGROUND

3.      Prior to June 20, 2018, RMS controlled and owned 100% of three affiliated companies operating in and around Booneville, Mississippi: (1) Pro South, Inc. ("Pro South"); (2) Pro Logging, Inc. ("Pro Logging"); and Pro Trucking, Inc. ("Pro Trucking"). Together, these companies operated a logging, trucking, and saw mill business in Booneville, Mississippi.

### A.   REGIONS EXTENDS LOANS TO PRO SOUTH, PRO LOGGING, AND PRO TRUCKING.

4.      To fund the operations of the businesses, these companies became obligated to Regions on a number of debt instruments, including the following:

a.      A term loan through which Pro South is indebted to Regions in the stated principal amount of $242,992.75 ("Loan 1"), which loan matured on July 23, 2018;

b.      A term loan through which Pro South is indebted to Regions in the stated principal amount of $149,951.75 ("Loan 2"), which loan matured on March 18, 2018;

c.      A term loan through which Pro South is indebted to Regions in the stated principal amount of $194,297.40 ("Loan 3"), which loan matured on January 31, 2018;

d.      A term loan through which Pro South is indebted to Regions in the stated principal amount of $418,292.25 ("Loan 4"), which loan matured on December 1, 2017;

e.      A working capital line of credit loan through which Pro South, Pro Logging, and Pro Trucking (this combination is sometimes referred to herein collectively as the "Borrowers") are indebted to Regions in the stated principal amount of $1,520,300.00 ("Loan 5"), which loan, absent certain defaults that have occurred, would have matured on November 3, 2026; and

f.      A term loan through which the Borrowers are further indebted to Regions in the stated principal amount of $3,202,000.00 (individually, "Loan 6," and together with Loan 1 – Loan 5, the "Loans"), which loan, absent certain defaults that have occurred, would have matured on November 3, 2036.

*See* Affidavit of Robert Smith, at ¶ 6.[1]

5.      Loan 5 is further evidenced and secured by (i) that certain Note dated November 3, 2016 from Borrowers in favor of Regions (as previously or hereafter amended, the "Loan 5 Note"); (ii) that certain Loan Agreement dated November 3, 2016 by and between Borrowers and Regions (the "Loan 5 Loan Agreement"); (iii) that certain Credit Agreement dated November 3, 2016 by and among Borrowers and Regions (the "Loan 5 Credit Agreement"); (iv) that certain Security Agreement –SBA dated November 3, 2016 from Borrowers and the Debtor in favor of Regions (the "Loan 5 Security Agreement 1"); (v) that certain Security Agreement dated November 3, 2016 from Borrowers in favor of Regions (the "Loan 5 Security Agreement 2"); (vi) that certain Unconditional Guaranty dated November 3, 2016 from the Debtor in favor of Regions (the "RMS Loan 1 Guaranty"); (vii) that certain Unconditional Limited Guarantee dated November 3, 2016

---

[1] The Smith Affidavit is submitted herewith as **Exhibit 1**.

from Amy Glissen Stites ("AGS" and together with RMS and the Borrowers, the "Obligors") in favor of Regions (the "AGS Loan 5 Guaranty"); and (viii) that certain Deed of Trust from Obligors for the benefit of Regions, as recorded November 7, 2016 as Instrument No. 2016004530 with the Prentiss County, Mississippi Chancery Court (the "Loan 5 Deed of Trust"). The Obligors pledged certain real property to Regions as collateral for Loan 5 pursuant to the Loan 5 Deed of Trust, and that real property collateral is referred to herein as the "Loan 5 Real Property Collateral." *See* Affidavit of Robert Smith, at ¶ 7. Copies of the Loan 5 Note, Loan 5 Loan Agreement, Loan 5 Credit Agreement, Loan 5 Security Agreement 1, Loan 5 Security Agreement 2, RMS Loan 1 Guaranty, AGS Loan 5 Guaranty, and the Loan 5 Deed of Trust are attached to the Smith Affidavit, as **Exhibits A–H**.

6.      Loan 6 is further evidenced and secured by (i) that certain Note dated November 3, 2016 from Borrowers in favor of Regions (as previously or hereafter amended, "the Loan 6 Note"); (ii) that certain Loan Agreement dated November 3, 2016 by and between Borrowers and Regions (the "Loan 6 Loan Agreement"); (iii) that certain Credit Agreement dated November 3, 2016 by and among Borrowers and Regions (the "Loan 6 Credit Agreement"); (vi) that certain Security Agreement – SBA dated November 3, 2016 from Borrowers and RMS in favor of Regions (the "Loan 6 Security Agreement 1"); (v) that certain Security Agreement dated November 3, 2016 from Borrowers in favor of Regions (the "Loan 6 Security Agreement 2"); (vi) that certain Unconditional Guaranty dated November 3, 2016 from RMS in favor of Regions (the "RMS Loan 6 Guaranty"); (vii) that certain Unconditional Limited Guarantee dated November 3, 2016 from AGS in favor of Regions (the "AGS Loan 6 Guaranty"); and (viii) that certain Deed of Trust from Obligors for the benefit of Regions, as recorded November 7, 2016 as Instrument No. 2016004529 with the Prentiss County, Mississippi Chancery Court (the "Loan 6 Deed of Trust"). *See* Affidavit

of Robert Smith, at ¶ 8. Copies of the Loan 6 Note, Loan 6 Loan Agreement, Loan 6 Credit Agreement, Loan 6 Security Agreement 1, Loan 6 Security Agreement 2, RMS Loan 6 Guaranty, AGS Loan 6 Guaranty, and the Loan 6 Deed of Trust are attached as **Exhibits I–P** to the Smith Affidavit. The Obligors pledged certain real property to Regions as collateral for Loan 6 pursuant to the Loan 6 Deed of Trust, and that real property is referred to herein as the "Loan 6 Real Property Collateral."[2] *See* Affidavit of Robert Smith, at ¶ 8. The Real Property Collateral is identically described in the Loan 5 Deed of Trust and the Loan 6 Deed of Trust, and consists of multiple parcels of real property in Prentiss County, MS. The various parcels of the Real Property Collateral are owned by Pro South, in its sole corporate capacity; Pro Logging, in its sole corporate capacity; RMS, in his sole individual capacity; Amy Glisson Stites ("AGS"), in her sole individual capacity; and RMS and AGS as Joint Tenants with Right of Survivorship. *See* Affidavit of Robert Smith, at ¶ 8. One of the parcels that is jointly owned by RMS and AGS, as Joint Tenants with Right of Survivorship, is an approximately 10-acre parcel, containing a single family home that, upon information and belief, **and according the Bankruptcy Petition**, is the primary residence of RMS, and has an address of 149 CR 1000, Booneville, MS, 38829 (the "Residence").[3]

### B.   REGIONS DECLARED EVENTS OF DEFAULT ON THE LOANS IN EARLY 2018

7.     The Obligors failed to satisfy their obligations with respect to the Loans pursuant to the terms and conditions of the documents evidencing and securing the Loans (collectively, the "Loan Documents"), and on February 1, 2018, Regions issued a formal written demand that the Loans be paid in full on or before February 8, 2018. *See* Affidavit of Robert Smith, at ¶ 9.

---

[2] The Loan 5 Real Property Collateral and the Loan 6 Real Property Collateral are described herein as the "Real Property Collateral."

[3] This Motion relates only to Loan 5, Loan 6, and the Real Property Collateral, which secures those loans.

8.   The Obligors failed to pay the Loans in full on or before February 8, 2018, and Regions implemented foreclosure procedures (the "First Foreclosure Proceedings") to foreclose on the Real Property Collateral, all of which is wholly located within Prentiss County, Mississippi. Regions scheduled the First Foreclosure Proceedings for June 5, 2018. *See* Affidavit of Robert Smith, at ¶ 10.

9.   At the request of RMS, Regions cancelled the First Foreclosure Proceedings in consideration of the Obligors entering into that certain Forbearance and Modification Agreement dated effective as of June 4, 2018 (as amended from time to time, the "Forbearance Agreement"). *See* Affidavit of Robert Smith, at ¶ 11.

**C.   RMS AND HIS COMPANIES BEGIN ENGAGING IN A BAD FAITH BANKRUPTCY SCHEME EFFECTING MULTIPLE BANKRUPTCIES TO DELAY REGIONS FROM EXERCISING ITS LAWFUL RIGHT TO FORECLOSE OBLIGORS' INTERESTS IN THE REAL PROPERTY, AND TO PREVENT OTHER CREDITORS FROM REPOSSESSING EQUIPMENT OWNED BY PRO LOGGING AND PRO TRUCKING.**

10.   Between June 20, 2018 and March 5, 2020, Russell Stites coordinated and authorized six (6) separate bankruptcy filings, all designed to delay Regions from foreclosing the Obligors' interest in the Real Property Collateral, or, in the case of the first two bankruptcies, to forestall another secured creditor from repossessing logging and trucking equipment in which it had a security interest that was senior to that held by Regions. *See* Affidavit of Robert Smith, at ¶ 12.

**a.   Pro Logging and Pro Trucking File Bankruptcy, Delaying the Repossession of their Equipment.**

11.   On June 20, 2018, Pro Logging filed under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court in the Northern District of Mississippi (the "Mississippi Bankruptcy Court"), Case No. 18-12388-SDM, (the "Pro Logging Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 13.

12.    Shortly thereafter, on June 22, 2018, Pro Trucking filed under Chapter 11 of the Bankruptcy Code in the Mississippi Bankruptcy Court, Case No. 18-12428-SDM ("Pro Trucking Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 14.

13.    The Pro Logging Bankruptcy and the Pro Trucking Bankruptcy were filed to prevent another Creditor, Commercial Credit Group ("CCG") from repossessing the majority of their logging and trucking equipment.  Pro Logging and Pro Trucking ultimately violated the adequate protection provisions granted to CCG by the Court, and CCG repossessed and liquidated all of its collateral, consisting primarily of logging equipment and trucks used by Pro Logging and Pro Trucking to conduct their businesses.

14.    During these bankruptcies, and at the Obligors' request, Regions modified the Forbearance Agreement and other Loan Documents pursuant to that certain Amendment to Forbearance and Modification Agreement dated October 19, 2018 to, *inter alia*, extend the maturity of the Loans (the "First Forbearance Amendment"). *See* Affidavit of Robert Smith, at ¶ 16.

15.    Unable to satisfy the terms and conditions set forth in the Forbearance Agreement, as modified by the First Forbearance Amendment, at the Obligors' request, Regions further modified the Forbearance Agreement and other Loan Documents pursuant to that certain Second Amendment to Forbearance and Modification Agreement dated November 5, 2018 (the "Second Forbearance Amendment"). *See* Affidavit of Robert Smith, at ¶ 17.

16.    The Obligors again failed to satisfy the terms and conditions of the Forbearance Agreement, as modified by the Second Forbearance Amendment, and on November 28, 2018, Regions issued a written demand to Pro South, RMS, and AGS for payment in full of the Loans on or before December 8, 2018. *See* Affidavit of Robert Smith, at ¶ 18.

17.     Pro South, RMS and AGS failed to pay the Loans in full on or before December 8, 2018. *See* Affidavit of Robert Smith, at ¶ 19.

18.     After filing various motions (including a motion for stay relief) in the Pro Logging Bankruptcy, attending hearings with witnesses, and incurring significant fees and expenses, Regions obtained an order from the Mississippi Bankruptcy Court granting Regions relief from the automatic stay in the Pro Logging Bankruptcy to foreclose on its collateral, which included, without limitation, the Real Property Collateral. *See Order on Motion for Relief from the Automatic Stay*, *In re Pro Logging, Inc.*,18-12388-SDM [Dkt. No. 174]; Affidavit of Robert Smith, at ¶ 20.

19.     The Pro Logging Case and the Pro Trucking Case were subsequently converted to cases under Chapter 7. *See Order Granting Motion to Convert Case to Chapter 7*, *In re Pro Logging, Inc.*, No. 18-12388-SDM [Dkt. No. 156]; *Order Granting Motion to Convert Case to Chapter 7*, *In re Pro Trucking, Inc.*, No. 18-12428-SDM [Dkt. No. 103]. On April 5, 2019, the Interim Chapter 7 Trustee in both cases, Jeffery Levingston filed Reports of No Assets, and abandoned all of the assets in those cases.[4] The Mississippi Bankruptcy Court subsequently issued orders closing those cases. *See Final Decree / Order Closing Case*, *In re Pro Logging, Inc.*, No. 18-12388-SDM [Dkt. No. 195]; *Final Decree / Order Closing Case*, *In re Pro Trucking, Inc.*, No. 18-12428-SDM [Dkt. No. 114].

20.     After obtaining stay relief in the Pro Logging Bankruptcy and the Pro Trucking Bankruptcy, Regions rescheduled, and republished, the foreclosure sale of the Real Property Collateral for June 25, 2019 (the "Second Foreclosure Proceeding"). *See* Affidavit of Robert Smith, at ¶ 21.

---

[4] This entry is a text-only entry made on the docket of the Pro Logging Bankruptcy and the Pro Trucking Bankruptcy.

### b. Pro South and RMS File Bankruptcy in Mississippi, Delaying the Second Foreclosure Proceeding

21.      The day before the June 25, 2019 foreclosure sale, Pro South filed for Chapter 7 protection in Northern District of Mississippi, delaying the scheduled foreclosure sale for a second time, Case No. 19-12549-SDM (the "First Pro South Bankruptcy"). *See* Affidavit of Robert Smith, at ¶ 22. The same day, RMS also filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code in the Mississippi Bankruptcy Court, Case No. 19-12552-SDM (the "First RMS Bankruptcy"). *Id.*

22.      Neither Pro South, nor RMS, actually prosecuted their Bankruptcy cases, and, just one month after Pro South and RMS filed their Chapter 7 bankruptcy proceedings in Mississippi, the Bankruptcy Court there dismissed both bankruptcy cases on July 24, 2019 for failure to timely file schedules and financial disclosures statements or to pay the required bankruptcy fees. *See Order of Dismissal for Failure to Timely File Documents or to Pay Required Fees*, Case No. 19-12552-SDM [Dkt. No. 21] (the "First RMS Bankruptcy Order of Dismissal"); *Order of Dismissal for Failure to Timely File Documents or to Pay Required Fees*, Case No. 19-12549-SDM [Dkt. No. 19] (the "First Pro South Bankruptcy Order of Dismissal"); Affidavit of Robert Smith, at ¶ 23. Thus, all these bankruptcies accomplished was to succeed in delaying the Second Foreclosure Proceeding.

### c. Pro South Files Second Bankruptcy in Texas, Delaying the Third Foreclosure Proceeding

23.      After the Mississippi Bankruptcy Court dismissed the First RMS Bankruptcy and the First Pro South Bankruptcy, Regions again issued foreclosure notices to interested parties and published foreclosure notices for a rescheduled September 4, 2019 foreclosure sale (the "Third Foreclosure Proceeding"). *See* Affidavit of Robert Smith, at ¶ 24.

24.     The morning of the scheduled September 4, 2019 foreclosure sale, Pro South filed

a Chapter 11 Petition in this Court, delaying the foreclosure sale for yet a *third* time, Case No. 19-

42427, and its counsel notified counsel for Regions while en route from Birmingham, AL to

Booneville, MS to conduct the sale (the "Second Pro South Bankruptcy"). *See* Affidavit of Robert

Smith, at ¶ 25.

### D.    PRO SOUTH ENTERS INTO AND QUICKLY BREACHES SETTLEMENT AGREEMENT

25.     Following the Second Pro South Bankruptcy, Regions filed the *Motion by Regions*

*Bank to Transfer Venue of Bankruptcy Case* [Dkt No. 11] (the "Venue Motion"), arguing that this

Court was an improper venue for the Second Pro South Bankruptcy, as all of Pro South's assets

and operations were located in Booneville, Mississippi. After a hearing in which Mr. Roderick

Kagy, the newly appointed CEO of Pro South testified that he had taken over all of the financial

operations of Pro South, and that he resided in this judicial district, the Court denied the Venue

Motion, without prejudice to Regions to right to refile it if subsequent evidence was developed to

show that venue in this district was indeed improper. *See Order Denying Motion to Transfer Case*

*to Another District* [Dkt. No. 36] (the "Venue Order"). At that point, Regions and Pro South,

entered into negotiations surrounding a settlement agreement to give Pro South time to secure

financing to replace Loans 5 and 6. Those negotiations were subsequently expanded to include

RMS, AGS, Pro Logging, and Pro Trucking. *See* Affidavit of Robert Smith, at ¶ 26. As a result of

those negotiations, Regions, Pro South, Pro Trucking, Pro Loggins, RMS, and AGS, entered into

a settlement agreement dated October 31, 2019 (the "Settlement Agreement"),[5] which included

---

[5] On December 10, 2019, this Court entered its *Order Approving Debtor's Settlement with Regions Bank*
*Pursuant to Fed. R. Bankr. P. 9019 and 4001(d)* [Dkt. No. 61] (the "Settlement Order").

certain concessions to Pro South, and which inured to the benefit of  Pro Logging, Pro Trucking,

RMS and AGS. *See* Affidavit of Robert Smith, at ¶ 26.

26.     Under the Settlement Agreement, the Obligors would receive, without limitation, a

complete release, and Regions was supposed to receive the following payments:[6]

> $20,000 (the "Initial Adequate Protection Payment");
>
> $22,500 on or before each of November 30, 2019, December 31, 2019, and January 25, 2019 (collectively, the "<u>Additional Adequate Protection Payments</u>" together with the Initial Adequate Protection Payment, collectively, the "<u>Adequate Protection Payments</u>"); and
>
> $4,350,000 (the "Total Settlement Amount") on or before January 31, 2020 (the "<u>Initial Settlement Payment Date</u>").
>
> The Obligors could extend the deadline for the Total Settlement Agreement for two 30-day periods upon the payment of a $50,000 extension fee.

*See* Affidavit of Robert Smith, at ¶ 27.

27.     The Obligors failed to timely deliver the required Additional Adequate Protection

Payments, as this Court is aware. *See* Transcript of January 21, 2020 Hearing in Pro South Case,

at 02:11–12 ("The debtor is a bit behind on its adequate protection payments."); Affidavit of Robert

Smith, at ¶ 28. Notwithstanding the payment defaults, Regions agreed to provide the Obligors

additional time to deliver the Additional Adequate Protection Payments. *See id.*, at 2:12–14 ("But

[Regions has] agreed to give the debtor some time to continue to operate and work on catching up

adequate protection payments."); Affidavit of Robert Smith, at ¶ 28.

28.     With respect to the Total Settlement Amount, the Obligors are dependent on

receiving take-out financing to make this payment. *See* Transcript of February 4, 2020 Hearing

---

[6] This paragraph only sets out the payment terms owed Regions by the Obligors under the Settlement Agreement. The Settlement Agreement imposes a bevy of other additional terms on the Obligors—however, given the Obligors' failure to meet the payment terms, the Obligors' failure or success in meeting any of the non-payment terms need not be discussed.

(hereinafter, "Feb. 4th Hearing Tr, at _____"), at 6:17–21 ("Did the debtor enter into a settlement agreement with Regions Bank that provided for a reduce[d] payoff, in exchange for some take-out financing that the debtor would obtain? Yes."). The Obligors have also failed, and continue to fail, to timely deliver the Total Settlement Amount. *See id.*, at 06:22–24 ("[A]s of January 2nd of this year, had the debtor formalized its take-out financing? No.").

29.     Between entry of the Settlement Order and February 6, 2020, the Obligors had committed numerous defaults under the Settlement Agreement, including: (1) failure to timely deliver the complete adequate protection payments due for, November 2019, December 2019, and January 2020;[7] (2) failure to pay 2019 ad valorem taxes; and (3) failure to deliver the Total Settlement Amount. On or around February 3, 2020, Regions gave the Obligors notice of, without limitation, the aforementioned defaults that the Obligors had committed in violation of the Settlement Agreement. *See* Affidavit of Robert Smith, at ¶ 28.

30.     Upon entry of the Settlement Order, Regions was granted immediate stay relief upon the occurrence of any Events of Default (defined therein), which included the "failure by any Obligor under this Agreement to observe or perform any term, condition, covenant, or agreement set forth herein[.]" Settlement Agreement, at 6 ¶ 5(a); *see* Affidavit of Robert Smith, at ¶ 29. The aforementioned defaults, *see supra*, at ¶ 28, constitute Events of Default. *See id.* at ¶ 29.

31.     On February 6, 2020, Regions provided additional notice of default, demand, acceleration, and also rescheduled, and republished, the foreclosure sale of the Real Property

---

[7] The Obligors have only made a single complete adequate protection payment—the Initial Adequate Protection Payment, and it was not paid until November 25, 2019. With respect to the adequate protection payment due in November of 2019, the Obligors paid $10,000.00 on December 12, 2019, and have failed to pay the remaining $12,500.00 owed with respect to that payment.

Collateral for March 5, 2020 (the "Fourth Foreclosure Proceeding"). *See* Affidavit of Robert Smith, at ¶ 30.

32.    At a subsequent hearing held on February 18, 2020, counsel for Pro South and Regions advised the Court that Pro South's defaults under the Settlement Agreement continued to exist, and that Regions had scheduled another Foreclosure Sale for March 5, 2020, as discussed below. Additionally, on March 16, 2020, Pro South filed the *Motion to Voluntarily Dismiss Debtor's Chapter 11 Bankruptcy Case* [Dkt. No. 97], seeking to dismiss the Second Pro South Bankruptcy just 194 days after filing it.

**E.    THE DEBTOR HOLDS INSURANCE PROCEEDS HOSTAGE IN VIOLATION OF THE CREDIT AGREEMENT.**

33.    Sometime in January, a tornado, or similar severe weather event, ran through Booneville, MS causing substantial damage to the Real Property Collateral (the "Event of Loss"). Despite this damage, Regions would not learn of the effect this natural disaster had on the Real Property Collateral until Rod Kagy testified about the subject in February, stating

> We had our scale house go down with high winds. It wasn't necessarily a tornado, but it was a high wind event. And, I mean, a mini tornado, which knocked the scale house out of operations for a week.

Feb. 4th Hearing Tr, at 7:19–22. Not only did the Obligors fail to provide Regions notice that a tornado had inflicted substantial damage to the Real Property Collateral, the Obligors further failed to provide Regions notice that they had: (1) made a claim to their insurance provider, Seneca Insurance (the "Insurer"), the day after the damage was sustained; and (2) received a $25,000 check from the insurer, with the expectation that they would receive an additional check for $175,000 (together, with the $25,000 check, the "Insurance Proceeds") in short order as an advance on the total distribution on their claim. *See* Affidavit of Robert Smith, at ¶ 31. A copy of the Insurance

Proceeds is attached as **Exhibit 2**. Regions would not learn of these facts until Rod Kagy disclosed to Regions counsel after it investigated the matter further. *See* Affidavit of Robert Smith, at ¶ 31.

34.       All of the Obligors' actions in the prior paragraph are defaults under the Loan Documents. *See* Affidavit of Robert Smith, at ¶ 32. Pursuant to the terms of the Deeds of Trust, the Obligors were required to promptly notify Regions of any Event of Loss, which event included a tornado tearing through the Real Property Collateral. *See id*. The Obligors failed to do that, *id*., instead attempting to retain the Insurance Proceeds and use them at their discretion.

35.       Once Regions learned that the Debtor committed the numerous Loan Document violations described above, Regions' counsel contacted the Insurer, and Renesant Insurance, Inc, agent for the Insurer, to inquire about the Insurance Proceeds. *See* Affidavit of Robert Smith, at ¶ 33. During these conversations, it was discovered, to the complete and utter astonishment of Regions, that Pro South allowed the hazard insurance policy to be cancelled its premium finance company, for non-payment of the monthly premiums due under the premium finance agreement, and that RMS had been made  fully aware of the impending cancellation through multiple notifications that the policy would be cancelled absent payment. *Id.* Given both the claim made on the Real Property Collateral, and the cancellation of the hazard insurance policy due to non-payment, Regions is informed that the Insurer will not reinstate the policy. *Id.* Accordingly, and perhaps most importantly to this Court's determination of this Motion, the Real Property Collateral is completely uninsured at present. *Id.*

36.       Additionally, RMS is presumably in possession of two checks issued by the Insurer, totaling $200,000 and has refused to turn over the proceeds, despite Regions' multiple demands that the Debtor turnover the Insurance Proceeds—such demands being made by letter and e-mail

on February 28, 2020 (letter), February 28, 2020 (e-mail), March 4, 2020 (e-mail), March 5, 2020

(e-mail), and March 11, 2020 (e-mail). *See* Affidavit of Robert Smith, at ¶ 34.

37.     Thus far, Regions demands for the Insurance Checks have been ignored, and or

refused.  It is believed that the Checks remain in the possession of RMS, as they were mailed to

the Booneville, MS office of Pro South.  However, neither RMS, Pro South, nor their counsel have

informed Regions as to who currently has possession of the Insurance Checks, or whether they

have been negotiated.

### F.     RMS Files Bankruptcy, Seeking to Delay the Fourth Foreclosure Proceeding.

38.     The morning of March 5, 2020, Joe A. Joseph ("Mr. Joseph"), counsel for Regions,

and Robert L. Smith, Jr., an officer of Regions Bank and its affiliate, LMIW VII, LLC, travelled

from Birmingham to Booneville, Mississippi to conduct the Fourth Foreclosure Proceeding at the

Prentiss County, Mississippi Courthouse. *See* Affidavit of Robert Smith, at ¶ 36**;** Affidavit of Joe

Joseph, at ¶ 1. A copy of the Affidavit of Joe Joseph is attached hereto as **Exhibit 3**. Expecting

that RMS and\or AGS might yet again try to delay the foreclosure sale through a bankruptcy filing,

on the day prior to the sale, as well as the day of the sale, Mr. Joseph instructed his paralegal,

Michael Carl Ivey ("Mr. Ivey") to regularly check the online PACER database to see if RMS, or

AGS, had filed bankruptcy the night of March 4, 2020, or the morning of March 5, 2020, even

though neither RMS or AGS, or anyone representing them had advised Mr. Joseph that such a

filing was forthcoming. *See* Affidavit of Joe Joseph, at ¶ 4. Mr. Ivey checked PACER periodically

on March 4, and on the hour, beginning at approximately 8:00 AM on March 5, and one last time

at approximately 11:30 AM. *See id.* With no bankruptcy filings having been discovered in

Mississippi, where RMS and AGS reside, Mr. Joseph commenced the Fourth Foreclosure

Proceeding at approximately 11:30 AM, and concluded it at approximately 12:10 PM. *See id.*

LMIW VII, LLC, an Alabama limited liability company affiliated with Regions, was the only

bidder at the sale, and purchased the Real Property Collateral with highest and best bid in the

amount of $2,057,834.00 (the "Foreclosure Sale"). *See* Affidavit of Joe Joseph, at ¶ 5. The

Substitute Trustee's Deed (the "Substitute Deed") was recorded in the Chancery Court of Prentiss

County, Mississippi at 12:59 PM, when the recording clerk returned from her lunch break.  A copy

of the Substitute Deed is attached as **Exhibit A** to the Affidavit of Joe Joseph.

      39.    Unbeknownst to Mr. Joseph, his associates, his Texas co-counsel in the Pro South

case, or any officers of Regions, at approximately 11:15AM on March 5, 2020, RMS filed the

present Chapter 13 bankruptcy proceeding in this Court (the "Second RMS Bankruptcy"). *See*

Affidavit of Joe Joseph, at ¶ 6. Counsel for RMS failed to call Mr. Joseph, his associates, his Texas

co-counsel, or Regions, to advise that the Debtor had filed the instant case. Instead, Counsel for

RMS, Mr. Robert Newark, e-mailed Mr. Joseph at approximately 11:19AM, on March 5, 2020,

according to the time-stamp on the e-mail writing:

> Joe:
>
> Attached to this email, please find notice of bankruptcy filing for
> my client, Russell Stiles[SIC]. Please stop any foreclosures sale
> from occurring today.
>
> Contact me directly if you have any questions.

*See* Affidavit of Joe Joseph, at ¶ 7. This e-mail was automatically flagged as spam by Burr &

Forman's e-mail server, and was not delivered directly to Mr. Joseph's inbox until approximately

1:15 PM, according to the time stamp on the spam e-mail notification. *See id.* at ¶ 8. Mr. Joseph

only became aware of Mr. Newark's e-mail at approximately 5:45 PM, upon his return to

Birmingham from Booneville, and his review of his spam report. *See id.*

      **G.**    **RMS INCLUDES PATENTLY FALSE INFORMATION IN HIS PETITION FOR RELIEF**

40.     In his Bankruptcy Petition, RMS indicates that "[o]ver the last 180 days before filing this petition, I have lived in this district longer than in any other district." Bankruptcy Petition, *Relief*, at 2 [Dkt. No. 1]. On the same page, RMS states his address as 149 [County Road] 1000, Booneville, MS 38829 (the "RMS's Address"). *Id.*  RMS's Address refers to his residence located on the combination of parcels forming the Real Property Collateral. RMS's Address is not located in the Eastern District of Texas, but rather in Booneville, MS.

41.     Additionally, RMS indicates that he estimates his liabilities to be $100,001–$500,000. *Id.*, at 6. To the contrary, solely with respect to the indebtedness owed to Regions on account of the RMS Guaranties of Loans 1-6, the Debtor is indebted to Regions in an amount in excess of $6,231,345.57. *See* Regions Proof of Claim 5-1, *In re Pro South*, Case No. 19-42427.

## IV.    <u>LEGAL ARGUMENT</u>

42.     The foregoing factual summary illustrates the manner in which RMS and his companies have abused the bankruptcy process for almost two years, through two states, in an effort to thwart Regions from foreclosing the Obligors' interest in the Real Property Collateral.  As a result, the balance of the equities weighs in favor of the automatic stay being annulled retroactively to validate the Foreclosure Sale, as to all of the parcels foreclosed, whether owned by RMS, RMS and AGS jointly, AGS, Pro South or Pro Logging.  While Regions believes that the automatic stay created by RMS's Chapter 13 filing did not apply to parcels owned by Pro South, Pro Logging or AGS, the fact that one of the owners of the multiple parcels included in the Foreclosure Sale filed for bankruptcy relief the same day as the Foreclosure Sale will undoubtedly create potential exceptions from a title insurance standpoint, and could make it impossible for Regions to give a subsequent purchaser of the non-RMS parcels a clean title binder, as is normally required in real estate sales transactions.  Moreover, Regions needs to move quickly to secure all of the Real Property Collateral, obtain hazard insurance on it, and negotiate with Seneca Insurance

Company with respect to the remainder of the Insurance Claim, which Mr. Kagy, the CEO of Pro

South, estimated could be as much as $1,000,000.

43.    "It is well settled that 'actions taken in violation of the automatic stay are not void,

but rather they are merely voidable, because the bankruptcy court has the power to annul the

automatic stay pursuant to the Bankruptcy Code, 11 U.S.C. § 362(d).'" *In re Jones*, 63 F.3d 411,

412 (5th Cir. 1995) (quoting *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir.

1990); *In re Vasquez*, No. 09-47043-DML 13, 2010 Bankr. LEXIS 610, at *5 (Bankr. N.D. Tex.

Mar. 3, 2010) ("[A]ctions in violation of the stay are 'voidable and [the defect in such an act is]

capable of discretionary cure' pursuant to section 362(d) of the Code.") (quoting *Sikes v. Global

Marine, Inc.,* 881 F.2d 176 (5th Cir. 1989)).

44.    The court in *Vasquez* articulated two tests to determine whether the automatic stay

should be retroactively annulled. One of the tests considered in *Vasquez* is a seven-factor test to

determine if the stay should be retroactively lifted to validate a foreclosure sale. Those seven

factors include:

> (1) if the creditor had actual or constructive knowledge of the
> bankruptcy filing; (2) if the debtor has acted in bad faith; (3) if there
> was equity in the property of the estate; (4) if the property was
> necessary for an effective reorganization; (5) if grounds for relief
> from the stay existed and a motion, if filed, would have been granted
> prior to the violation; (6) if failure to grant retroactive relief would
> cause unnecessary expense to the creditor; and (7) if the creditor has
> detrimentally changed its position on the basis of the action taken.

2010 Bankr. LEXIS 610, at *10 (citing *Thornburg*, 227 B.R. at 731, n.18). This test compels

annulment of the stay.

45.    First, neither Regions, nor Regions' counsel Mr. Joseph were aware of RMS's

bankruptcy filing prior to conducting the Foreclosure Sale. With respect to factors two through

four: (i) RMS has blatantly, and repeatedly, acted in bad faith by: (a) previously filing, for himself

or his companies, five–now six–bankruptcy cases, the last 4 of which were filed on the eve, or day, of foreclosure for the sole purpose of frustrating Regions' legitimate attempts to  foreclose the Obligors' interest in the Real Property Collateral, despite the Obligors having no equity in the Real Property Collateral, *see In re Fennell*, No. 17-20095-RLJ13, 2017 WL 7050633, at *5 (Bankr. N.D. Tex. Nov. 13, 2017) ("[C]ourts are permitted to make the inference that serial filings, the purpose of which is to stop a pending foreclosure, qualify as a scheme to delay, hinder, or defraud a creditor's rights in that property."); *see also In re Henderson*, 395 B.R. 893, 902 (Bankr. D.S.C. 2008) (relying also on the court's precedent that "filings by multiple parties" are construed as filings "by a single entity when done to protect a common asset"), (b) making false representations in his Bankruptcy Petition concerning the nature of RMS's debts and his place of residence in order to qualify as a debtor under Chapter 13 in this venue, (c) refusing to deliver to Regions the Insurance Proceeds of $200,000.00, despite multiple demands that he do so; (d) allowing the Hazard Insurance on the Real Property Collateral to be cancelled for failure to pay the monthly premiums to the Premium Finance Company; (ii) RMS has no ability to reorganize either his own financial affairs, or Pro South, given the amount of secured debt owed to Regions, the IRS and multiple other creditors holding judgment liens on the Real Property Collateral;[8] and (iv) RMS is totally unable to generate cash flow or make use of sources of income to sustain a plan of reorganization or effect a reorganization that is reasonably in prospect. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375–76 (1988) (holding that 11 U.S.C. § 362(d)(2) requires "not merely a showing that if there is conceivably to be an effective

---

[8] At least fifteen (15) judgment or tax liens have been recorded against—whether individually, or in some combination—Pro South, AGS, Pro Logging, or RMS, as set forth in greater detail on pages 4–5 of that certain  Title Commitment Policy dated September 12, 2019, and issued by Old Republic National Title Insurance Company (the "September 2020 Title Commitment"). The September 2020 Title Commitment is attached hereto as **Exhibit 4**.

reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.*"). Additionally, Regions has been suffering unnecessary expense since RMS and his companies entered into the Forbearance Agreement in 2018 to avoid the First Foreclosure Proceeding, and then entered into the 2nd, 3rd, 4th and 5th Bankruptcies to avoid the Second, Third and Fourth Foreclosure Sales.  Regions will continue to suffer unnecessary expense if it forced to re-publish and re-notice a Fifth Foreclosure Sale.  . If the automatic stay is not retroactively annulled, Regions will potentially incur several thousand more dollars in publication and title costs.

46.      The other test articulated in *Vasquez* is "whether, if relief from the stay had been sought before the action in violation of the stay was taken, the relief would have been granted." 2010 Bankr. LEXIS 610, at *6. This test compels the result that the stay in RMS's case should be retroactively annulled.

## A.  THE AUTOMATIC STAY WOULD BE DUE TO BE LIFTED FOR CAUSE UNDER 11 U.S.C. § 362(d)(1).

47.      "Under 11 U.S.C. § 362(d)(1), the court may grant relief from the automatic stay 'for cause[.]'" *In re Fowler*, 259 B.R. 856, 858 (Bankr. E.D. Tex. 2001). A "bad-faith filing is a recognized cause for relief[.]" *In re Omni Lion's Run, L.P.*, 578 B.R. 394, 398 (Bankr. W.D. Tex. 2017). Without repeating the analysis above, the bad faith of the Debtor is patently evident based on his misrepresentations, inability to reorganize, his conduct surrounding the Insurance Proceeds and cancellation of insurance coverage, and years-long scheme to avoid Regions' lawful foreclosure of his and the remaining Obligors' interests in the Real Property Collateral. *See supra*, at ¶ 44.

48.      Beyond "bad faith," a "lack of adequate protection of an interest in property is . . . one of the means by which a creditor may show cause for relief from stay." *Marable v. Bank of*

*New York Mellon*, 557 B.R. 521, 527 (E.D. Tex. 2016). "Cause" is further met on these grounds, as: (1) Regions lacks adequate protection in the Real Property Collateral <u>and</u> the Insurance Proceeds; (2) RMS, Pro South, and the other Obligors have failed to offer (or pay) adequate protection payments to Regions for the continued use and enjoyment of the Real Property Collateral; and (3) the Real Property Collateral has suffered substantial damage due to natural disasters <u>and</u> is presently uninsured, due solely to acts of RMS and Pro South.

49.     Perhaps the strongest evidence that relief from the stay would have been granted had it been sought before the Foreclosure Sale occurred, is the fact that both this Court and the U.S. Bankruptcy Court for the Northern District of Mississippi have previously provided for stay relief with respect to the Real Estate Collateral. *See generally Settlement Order*, at 2 ¶ 3 ("The automatic stay arising under 11 U.S.C. § 362 in this Bankruptcy Case is hereby immediately terminated to permit Regions to pursue any and all of its rights and remedies under the Loan Documents and applicable law with respect to the Loans and the Collateral."); *Order on Motion for Relief from the Automatic Stay*, *In re Pro Logging, Inc.*, Case No. 18-12388-SDM [Dkt. No. 174] (the "Pro Logging Stay Relief Order"). Moreover, under the Settlement Order, "if any Obligor other than Pro South, Inc. files for relief under the Bankruptcy Code or is subject to any involuntary bankruptcy filings, such Obligor or Obligors shall consent to, and permit, Regions to obtain relief from the automatic stay." Settlement Order, at 3 ¶ d. RMS is a party to the Settlement Agreement, and has therefore consented to grant Regions relief from the automatic stay in *any* bankruptcy case filed by him.

50.     Given the foregoing, *see supra,* at ¶ 46–48, the test articulated in *Vasquez* requiring the movant to demonstrate that stay relief would have been granted prior to the challenged action is met, and this Court should annul the automatic stay.

**B.** **THE AUTOMATIC STAY WOULD BE DUE TO BE LIFTED GIVEN THE LACK OF EQUITY IN THE REAL PROPERTY COLLATERAL AND THE ABSENCE OF A REORGANIZATION THAT IS REASONABLY IN PROSPECT.**

51.    Section 362(d)(2) additionally provides for relief from the automatic stay if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization." Without repeating the analysis provided above, this is the situation with respect to the Real Property Collateral. First, the appraised value of the Real Property Collateral, as of January 8, 2020 is between $2,150,000.00–$2,225,000.00. *See* Robert Smith Affidavit, at ¶ 38. A copy of the appraisal is attached as **Exhibit 5**. The total indebtedness the Obligors owe Regions alone, and which is secured by the Real Property Collateral is in excess of $6,231,345.57. *See supra*, at ¶ 40; Regions Proof of Claim 5-1, *In re Pro South*, Case No. 19-42427. There is no equity in the Real Property Collateral.

52.    Not only is there no equity in the Real Property Collateral, there is no possibility of reorganization of RMS, given the legion of debts and judgements against him and his companies. Importantly, while Regions, as "[t]he party requesting relief has the burden of proof on the issue of the debtor's equity in the property. The party opposing relief has the burden of proof on all other issues." *In re Lowe*, No. 09-37600-H3-7, 2010 WL 817168, at *2 (Bankr. S.D. Tex. Mar. 4, 2010). Thus, it is RMS's burden to prove that "the Debtor can show a reasonable prospect for a successful reorganization within a reasonable time." *In re Brentwood Grp. No. 1 Ltd.*, No. 10-80093-G3-11, 2010 WL 2900327, at *10 (Bankr. S.D. Tex. July 21, 2010). Regions submits that if this was possible, RMS would have done so in the First RMS Bankruptcy. Additionally, RMS's income is derived from the operations of Pro South, which, as a debtor, has been unable to generate income sufficient to pay the Adequate Protection Payments under the Settlement Agreement. RMS's main, and likely sole, source of income has failed to satisfy its own obligations, thus, there is no indication, that RMS could effectively reorganize within a reasonable time. Moreover, Pro South

has filed a Notice of Withdrawal of its Motion to Use Cash Collateral, essentially signaling the

death knell of the Pro South Chapter 11 case. *See Notice of Withdrawal of Hearing on Debtor's*

*Emergency Motion for Use of Cash Collateral*, Case No. 19-42427 [Dkt. No. 95].[9] Accordingly,

cause also exists under Section 362(d)(2).

**C. THE AUTOMATIC STAY WOULD BE DUE TO BE LIFTED GIVEN THE DEBTOR'S ON-GOING SCHEME TO DELAY REGIONS FROM FORECLOSING THE OBLIGORS' INTEREST IN THE REAL PROPERTY COLLATERAL THROUGH MULTIPLE BANKRUPTCY FILINGS.**

53.    In addition to constituting cause to lift the stay pursuant to § 362(d)(1), multiple

bankruptcies filed for dilatory purposes, in and of themselves, constitute an independent basis for

lifting the automatic stay pursuant to § 362(d)(4). In order to obtain relief under section 362(d)(4),

the Court must find that the filing of the bankruptcy case was part of a scheme to delay, hinder and

defraud creditors. 11 U.S.C. § 362(d)(4). The Bankruptcy Code does not define "scheme," but in

accordance with the definition in Black's Law Dictionary, it has been held to be "an intentional

artful plot or plan to delay, hinder or defraud creditors." *In re Duncan & Forbes Development,*

*Inc.*, 368 B.R. 27, 32 (Bankr. C.D. Cal. 2006).

54.    With respect to the terms "delay", "hinder" and "defraud", these are considered

"...terms of art in the legal system and in bankruptcy law..." and are properly construed in

accordance with fraudulent transfer law. *Id.* at 34. "To delay and hinder a creditor is to forestall it

efforts in collecting on its debt unlawfully." *Id.*

55.    As previously noted, RMS, as 100% shareholder, controlled Pro Logging, Pro

South, and Pro Trucking on the dates that they filed their various bankruptcies. *See supra*, at ¶ 3.

In the case of the First Pro South Bankruptcy, the First RMS Bankruptcy, the Second Pro South

---

[9] At the risk of stating what is hopefully obvious, the Real Property Collateral owned by Pro South and Pro Logging are not necessary to RMS' reorganization, as RMS does not own that property. As such, all that is necessary to establish cause under Section 362(d)(2) is a finding that the limited Real Property Collateral owned by RMS is not necessary to an effective reorganization that is reasonably in prospect.

Bankruptcy, and the Second RMS Bankruptcy, each was initiated on either the day of a scheduled foreclosure or on the eve of foreclosure. *See supra*, at ¶¶ 20, 23, 38. This scheme, to wait to file bankruptcy to avoid a lawful, duly scheduled, and duly noticed foreclosure, is the very sort of dilatory scheme of multiple filings that Section 362(d)(4) is intended to guard against. *See In re Hymes*, No. A12–00599–GS, 2013 WL 653060, at *5 (Bankr. D. Alaska Feb. 20, 2013) ("Courts have consistently recognized that repeated bankruptcy filings made on the eve of successive foreclosure attempts constitute strong evidence of an intent to delay and hinder secured creditors from collection.").

56.    Applying either of the tests articulated in *Vasquez* to this case, it is clear that the relevant considerations support retroactively annulling the automatic stay. As the court provided in *In re Fennell*, "Debtors who act unreasonably and whose cases do not present a 'sufficient indicia of good faith' should not receive protection from the automatic stay, particularly when the case is motivated by successive filings to stop pending foreclosure sales." No. 17-20095-RLJ13, 2017 WL 7050633, at *5 (Bankr. N.D. Tex. Nov. 13, 2017). For almost two years, RMS, either by himself or through his various companies has brought successive filings solely to stop pending foreclosure sales. To prevent the Debtor from further abusing the bankruptcy process, the Court should not grant RMS protection of the automatic stay.

## V.    CONCLUSION

57.    Based on the foregoing, the Court should grant this Motion and order the retroactive annulment of the automatic stay.

Dated: March 17, 2020

Respectfully submitted,

/s/ George H. Barber
George H. Barber
State Bar No. 01705650
Email: gbarber@johnstonpratt.com
Johnston Pratt PLLC
1717 Main Street, Suite 3000
Dallas, Texas 75201
214-974-8000 – Telephone
214-474-1750 – Facsimile

Joe A. Joseph (Admitted Pro Hac Vice)
Of Counsel
Alabama State Bar No. ASB-2964-J50J
Email: jjoseph@burr.com
Burr & Forman LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
205-251-3000 – Telephone
205-458-5100 – Facsimile

ATTORNEYS FOR REGIONS BANK

## CERTIFICATE OF SERVICE

This is to certify that on March 17, 2020, a true and correct copy of the foregoing pleading was served, (1) by ECF service on all entities receiving ECF service, (2) by first class mail to the addresses below and (3) by email where an email is noted below.

Russell Stites
619 Highway 30E
Booneville, Mississippi 38829
russell@prologging.com

Bob Newark
1341 W Mockingbird Ln Ste 600W
Dallas, TX 75247-6904
robert@newarkfirm.com

Carey D. Ebert
Chapter 13 Trustee
PO Box 941166
Plano, TX 75094-1166
Ch13plano@cha13plano.com

Ruth Yeager, Esq
U.S. Attorney
110 N. College Ave., Suite 700
Tyler Tx 75702-0204
ruth.yeager@usdoj.gov

Internal Revenue Service
Mail Code-DAL-5020
1100 Commerce Street
Dallas, Texas 75242-1100

Internal Revenue Service
Centralized Insolvency
PO Box 7346
Philadelphia, PA 19101-7346

Office of the Attorney General
Internal Revenue Service
900 Jefferson Avenue
Oxford, MS 38655-3608

/s/ George H. Barber
George H. Barber